THE QUEEN EMMA FOUNDATION, a Hawaii non–profit corporation, Plaintiff–Appellee, v. **AQUILINO PARAISO TINGCO, JR.** and **ADELA FEDERE TINGCO**, Defendants–Appellants

NO. 15346

(CIV. NO. H89–6502)

THE QUEEN EMMA FOUNDATION, a Hawaii non–profit corporation, Plaintiff–Appellee, v. **CORAZON VILLANUEVA RAMIRO** and **LYDIA SALUDES RAMIRO**, Defendants–Appellants

NO. 15348

(CIV. NO. H89–6501)

DECEMBER 28, 1992

LUM, C.J., WAKATSUKI,* MOON, KLEIN, AND LEVINSON, JJ.

---

*Associate Justice Wakatsuki, who heard oral argument, passed away on September 22, 1992. *See* HRS § 602–10 (1985).

## OPINION OF THE COURT BY KLEIN, J.

Defendants–Appellants Aquilino and Adela Tingco (Tingcos) and Corazon and Lydia Ramiro (Ramiros) (collectively Appellants or lessees) filed separate appeals from the district court's summary possession judgments in favor of Plaintiff–Appellee Queen Emma Foundation (QEF).[1] On appeal, Appellants argue that the district court did not have jurisdiction to hear the dispute, or alternatively, that there was insubstantial evidence to support the court's findings of fact and conclusions of law. We vacate the judgments because the district court lacked jurisdiction to order summary possession and remand for proceedings consistent with this opinion.

---

[1] *Queen Emma Foundation v. Tingco*, Supreme Court No. 15346, and *Queen Emma Foundation v. Ramiro*, Supreme Court No. 15348, were heard together although no formal order of consolidation was filed.

I.

In January 1975, Queen's Medical Center (QMC),[2] as the fee owner of the Makalapa Subdivision, granted the State of Hawaii (State) a fuel pipeline easement across the subdivision for energy corridor purposes pursuant to Hawaii Revised Statutes (HRS) Chapter 277. In granting the easement to the State, QMC agreed that it would not erect or place any permanent buildings, structures, or improvements upon or below the surface of the easement area unless (1) there was no unreasonable interference with the use of, or access to, the easement area, nor damage to the energy transmission system, and (2) plans for said structures or improvements would first be submitted to and approved in writing by the State of Hawaii.

1. **The Tingcos' Lease**

On June 14, 1985, the Tingcos signed a ground lease with QEF for a vacant lot in the Makalapa subdivision to be used for residential purposes. On February 24, 1986, QEF executed an Amendment of Lease granting the Tingcos a lease with a fifty–five year term. Sometime after the execution of the lease, without prior written permission from the State or QEF, the Tingcos constructed a hollow tile wall in the easement area of their lot to prevent soil erosion and to secure the property. In April 1986, the State discovered the wall and notified the Tingcos that they were in violation of the lease provision which prohibited the Tingcos from building improvements into the easement. The State also notified QEF of the violation and QEF in turn contacted the Tingcos. In November 1989, the State threatened to commence litigation against

---

[2] Queen's Medical Center is the predecessor in interest to the Queen Emma Foundation.

QEF claiming that the encroachment posed a potential danger to the fuel pipeline. QEF urged the Tingcos to remove the wall, but the Tingcos failed to do so.

In December 1989, as a result of the Tingcos' failure to abate the encroachment, QEF filed a complaint for summary possession in district court. Meanwhile, the Tingcos considered modifying the wall so they could retain the portion of the wall that was outside the easement. In August 1990, after numerous attempts were made to secure permission from the State to retain part of the wall, the Tingcos removed the entire wall. However, the Tingcos refused to reimburse QEF for the attorney's fees and costs they incurred prior to the Tingcos' removal of the wall. QEF therefore decided to pursue the instant summary possession action in district court.

At a pretrial conference, QEF and the Tingcos stipulated to submit the case to the district court solely upon written memoranda and exhibits. In their written submission, the Tingcos argued that the district court did not have subject matter jurisdiction because the case involved a question of title to real estate. *See* Hawaii Revised Statutes (HRS) § 604–5(d) (1985).[3] They further argued that the circuit court had jurisdiction pursuant to HRS § 603–21.7(a)(3) (1985).[4]

---

[3] HRS § 604–5(d) provides in relevant part that "[t]he district courts shall not have cognizance of real actions, nor actions in which the title to real estate comes in question[.]" HRS § 604–5 (1985).

[4] HRS § 603–21.7(a)(3) provides as follows:

**Nonjury cases.** The several circuit courts shall have jurisdiction, without the intervention of a jury except as provided by statute, as follows:

(a) Of actions or proceedings:

. . . .

The district court, nevertheless, assumed jurisdiction pursuant to HRS chapter 666 and ruled that the Tingcos had materially breached the lease. The court awarded QEF attorney's fees and costs under a provision in the lease, but refused to cancel the lease because the Tingcos had voluntarily removed the wall.

## 2. The Ramiros' Lease

On July 10, 1985, the Ramiros entered into a fifty–five year ground lease with QEF for a vacant lot in the same Makalapa subdivision as the Tingcos. The Ramiros' lease, like the Tingcos', was for residential purposes and subject to the same fuel pipeline easement in favor of the State.

On August 1, 1985, the Ramiros obtained a building permit from the Building Safety Division of the City and County of Honolulu to construct their residence. On October 6, 1987, another building permit was issued by the Building Safety Division of the City and County.

In April 1986, the Ramiros received notice from QEF that a corner of their residence and some other improvements were constructed over the easement area without the written consent of the State. Nevertheless, the Ramiros continued construction pursuant to their blueprints, because they claimed that their building plans could not have been lawfully modified without the approval of the Building Department of the City and County of Honolulu.

Although the Ramiros' blueprints provided for the house to be built four feet outside of the easement area,

---

[e]xcept when a different provision is made they shall have original and exclusive jurisdiction of all other cases in the nature of suits in equity, according to the usages and principles of courts of equity[.]

HRS § 603–21.7(a)(3) (1985).

the improvements actually encroached 4.85 feet into the energy corridor. The encroaching improvements included part of the concrete foundation, a corner of the residence, stairs, and roof overhangs.

In November 1989, the State Department of Transportation threatened to commence litigation against QEF, asserting potential danger to the fuel pipeline posed by the Ramiros' unauthorized encroachments. QEF, in turn, urged the Ramiros to remove the improvements. The Ramiros, however, failed to abate the encroachment, alleging that they were unable to do so. Finally, in December 1989, QEF filed a complaint in district court requesting cancellation of the lease and summary possession.

At a pretrial conference held in November 1990, QEF and the Ramiros stipulated to submit the case to the court solely upon written memoranda and exhibits. Like the Tingcos, the Ramiros argued that the district court was without subject matter jurisdiction, and they requested refiling the action in circuit court.

The district court assumed jurisdiction and entered a judgment in favor of QEF. The district court ordered the Ramiros to remove all improvements which encroached into the energy corridor within 120 days from the entry of judgment. If the Ramiros failed to timely remove the improvements, the judgment further entitled QEF to move the court for an order declaring forfeiture of the lease, issuing a judgment for possession, and issuing a writ of possession against the Ramiros. The court also held that QEF could petition the court for recovery of its attorney's fees and costs.

## II.

Summary possession is a statutory proceeding that enables a landlord to regain possession of his property and

remove any tenant who is wrongfully in possession of the land in question. **Kimball v. Lincoln**, 72 Haw. 117, 124, 809 P.2d 1130, 1134 (1991); HRS § 661-1 (1985). The purpose of a summary possession proceeding is to provide a prompt remedy for landlords against tenants who have violated a material condition of their lease or have wrongfully withheld possession after expiration of the lease. *See* **Harrison v. McCandless**, 22 Haw. 129, 130 (1914). Furthermore, this statutory proceeding avoids the delay and expense incident to the common law remedy of ejectment.[5] *Id.*

The Appellants argue that the district court did not have jurisdiction over QEF's summary possession actions.[6] In the instant case, QEF, as lessor, filed complaints in district court seeking cancellation of Appellants' leases, recovery of possession of the premises, and damages for the expense of removing the encroachments. Although claims such as these typify the ordinary summary possession action, a review of the record convinces us that the district court did not have subject matter jurisdiction pursuant to HRS § 604-5(d).

---

[5] Ejectment is a common law action once used to recover possession of land and for damages for the unlawful detention of its possession. The lessor or real party in interest had to establish title in order to warrant recovery. The common law action for ejectment has been modified by statute in many states and may come under the title of action for summary process, action for eviction, or forcible entry and detainer actions. *See* BLACK'S LAW DICTIONARY 516 (6th ed. 1990).

[6] Appellants argue that the district court did not have jurisdiction over the summary possession complaints for the following reasons: (1) both cases involve an interpretation of a lease and an easement with a third party that raises the question of title to real estate; and (2) the district court exercised equity powers in fashioning a remedy when only the circuit court has equity jurisdiction under HRS § 603-21.7(a)(3) (1985).

## A.

The Appellants held marketable property interests in their fifty–five year, renewable ground leases. The lease agreements with QEF anticipated a long–term relationship between lessor and lessees, that enabled and required lessees to build their residences on the leased land.[7] At the end of the lease term, a non–defaulting lessee is entitled to a 30 day period to remove his or her improvements. However, if the lease is forfeited due to the lessees' default, the lessor retains the improvements.[8] The lease further acknowledges the possibility that Appellants might mortgage and later sell their "leasehold interest." The lease even provides the lessees with the right to assign and mortgage the lease without the approval and consent of the lessor.[9] Thus, the

---

[7] Paragraph 8 of Appellants' lease, entitled "Residential Use," provides: "Lessee will use and allow the use of said premises only for residential purposes, and will not at any time during said term erect, place, maintain or allow on said premises more than one single–family dwelling[.]"

[8] Paragraph 17 of Appellants' lease, entitled "Surrender," provides:

*At the end of said term or other sooner determination of this lease Lessee will peaceably deliver up to Lessor possession of the demised land, together with all erections and improvements upon or belonging to the same, by whomever made, in good repair, order and condition except as aforesaid*; provided, however, that if not then in default hereunder lessee may within 30 days after such termination remove all buildings standing thereon.

(Emphasis added).

[9] Paragraph 17(C) of Appellants' lease, entitled "Assignments," provides:

*Lessee may assign or mortgage this lease without the approval or consent of Lessor,* and the assignee shall have the same rights and obligations hereunder as the original Lessee; provided, however,

leasehold interests granted by QEF to Appellants involve ownership rights in the leasehold estate as well as the right to exclusive possession.

The State legislature has recognized that Hawaii's limited supply of land is controlled to a great extent by a few large landowners. HRS § 516–83(1) (1985). Some of these fee owners have chosen to lease their property under long–term leases resulting in a shortage of fee simple residential land. HRS § 516–83(2). Thus, many people, such as the Appellants, must accept long–term ground leases in order to acquire the land needed to build their homes. Consequently, long–term ground leases have evolved into sophisticated instruments that grant property rights beyond mere possession. For example, Hawaii residential leases often include a provision that permits lessees to mortgage and sell their leasehold estates, thereby implicating the interests of third parties when lessees mortgage or transfer their leasehold estates. In effect, lessees such as the Appellants have been granted leasehold title to real property by their lessor, which for commercial and other legal purposes, is similar to fee simple ownership.[10]

---

that no such assignment shall be effective to transfer any interest in this lease unless Lessor shall have received a true and executed copy of such assignment or written notice thereof[.]

(Emphasis added).

[10] We recognize that lessee's interests are of limited duration and require the payment of rent to the leased fee owner. Nevertheless, assuming the fixed rent period is of sufficient length, a lessee's leasehold estate may be readily mortgaged. As noted earlier, both the Tingcos and Ramiros were required to build their homes on the leased land, and it was contemplated that they would be able to mortgage their proprietary interests to raise the funds to build.

Hawaii's Land Reform Act is further evidence that in some situations a lease is considered to be an interest in the nature of title to real

This court's ruling in ***Harrison v. McCandless***, 22 Haw. 129 (1914), further supports the proposition that a lessor seeking to dispossess a long–term lessee must file his complaint in circuit court because title to real estate is in question. In *Harrison*, the lessor alleged in district court that the lessee held certain premises as a holdover tenant under a one–year parol lease.[11] The lessee successfully tested the jurisdiction of the district court by claiming to hold the premises as assignee of an unexpired ten–year leasehold interest. This court stated in *Harrison* that:

> Here, the *defendant* denies the execution of the parol lease alleged by the plaintiff, and *asserts*

---

property. The legislature has defined "lease" as a *"conveyance of land or an interest in land*, by a fee simple owner as lessor . . . to any person, in consideration of a return of rent or other recompense, for a term, measured from the initial date of the conveyance, twenty years or more[.]" (Emphasis added). Under certain circumstances, ownership of such an interest in land gives the lessees an opportunity to apply for the condemnation and transfer of the fee interest from the lessor to the individual lessees. *See* HRS chapter 516; ***Hawaii Housing Authority v. Lyman***, 68 Haw. 55, 704 P.2d 888 (1985). The Hawaii Land Reform Act also provides that residential leases are freely assignable. *See* HRS § 516–63 (1985).

Furthermore, in regard to the assessment of property taxes, the lessee is deemed the owner of the real property. HRS § 246–4 provides:

> **Assessment of property; to whom in general.** Real property shall be assessed in its entirety to the owner thereof; *provided that where improved residential land has been leased for a term of fifteen years or more, the real property shall be assessed in its entirety to the lessee* or the lessee's successor in interest holding the land for such term under such lease and *the lessee or successor in interest shall be deemed the owner of the real property in its entirety for the purposes of this chapter*[.]

HRS § 246–4 (1985) (emphasis added).

[11] It is unclear from *Harrison* as to whether the premises were improved or unimproved.

*possession and the right of possession under a written lease for a term of years* executed by E.P. Aikue and Mrs. A. Harrison to Gum Lock, running until December 31, 1916, and assigned to the defendant. *This is an assertion of title, raised a question of title, and ousted the district court of jurisdiction. Any instrument which is evidence of the exclusive right of possession of land in a party, is title*; and the assertion of such raises a question of title[.]

*Id.* at 131 (emphasis added).

## B.

HRS chapter 666, the summary possession statute, was enacted to provide an expedient remedy to restore a landlord to the possession of his premises when it is clear that the tenant holds nothing more than a possessory interest in the property. When a long–term ground lease is involved, the lessee often holds more than a possessory interest and the relationship between the landlord and tenant may be more complex. In the present case the district court remedy of summary possession is ill–suited to protect the rights and determine the obligations of all parties with an interest in these long–term leasehold estates.[12]

Here, QEF has attempted to cancel the Appellants' leases and regain possession of their premises. The district court refused to grant QEF's prayers for relief and

---

[12] Because they are courts of limited jurisdiction, district courts are powerless to exercise equity jurisdiction, which is solely available in circuit court. *See supra* note 4.

instead chose to fashion an equitable remedy. Although the district court decided that the leases had been materially and substantially breached and that forfeiture was justified, the court nevertheless refused to terminate the leases. Instead, the Tingcos were ordered to pay QEF's attorney's fees and costs because they had removed their fence and cured the breach without appreciable damage to QEF. As for the Ramiros, the district court stated that "[e]quity abhors a forfeiture and in this case, the court is able to grant relief from a forfeiture of the lease by ordering that the breach be remedied." The district court held that "[t]he appropriate remedy for the breach herein is the removal of all elements of Defendants' residence which intrude into the Energy Corridor[.]" It is evident that the district court, without legal authority, sought to fashion an equitable result taking into consideration the hardship that would befall Appellants through a lease forfeiture.

The inequity that the district court strived to avoid was the prospect that the Appellants would, in a summary manner, be dispossessed of a valuable property right upon which they relied in building their homes. The "Surrender" provision of the lease provided that a defaulting lessee has no entitlement to the improvements once the lease is cancelled. Therefore, if the district court granted summary possession in favor of QEF, under the lease agreements with Appellants, QEF would be entitled to the Appellants' homes.

## C.

We hold today that long–term residential ground leases, such as those held by Appellants, cannot be cancelled or forfeited in a district court summary possession action under HRS chapter 666. In contradistinction, actions to dispossess lessees involving short–term rental

agreements or other leases that grant lessees solely the right of possession may only be adjudicated in district court, pursuant to HRS § 666–6.[13] This is because such actions cannot be characterized as involving title to property or a right of property beyond mere possession. Because HRS § 604–5(d) limits the civil jurisdiction of the district court by excluding real actions or actions involving title to real property, the only court that may take cognizance of actions seeking the cancellation or forfeiture of the Appellants' leases is the circuit court.

In most cases, submitting a long–term lease dispute to the circuit court will not significantly increase the lessor's hardship or unduly delay a remedy. While the action is pending resolution in circuit court, a landlord may petition the court to establish a rent trust fund pursuant to HRS § 521–78 (1985)[14] and thereby alleviate the problem caused by lost rental income.

---

[13] For example, in *Lum v. Sun*, 70 Haw. 288, 769 P.2d 1091 (1989), we held that the district court had jurisdiction to dispossess tenants who were in possession of property and the landlord's improvements under a six–year lease. Clearly, the district court had jurisdiction under HRS § 666–6 to hear and decide the possession issue and order eviction.

[14] HRS § 521–78 provides in relevant part:

**Rent trust fund.** (a) At the request of either the tenant of landlord in any court proceeding in which the payment or nonpayment of rent is in dispute, the court shall order the tenant to deposit any disputed rent as it becomes due into the court as provided under subsection (c) . . . . No deposit of rent into the fund ordered under this section shall affect the tenant's rights to assert either that payment of rent was made or that any grounds for nonpayment of rent exist under this chapter.

(b) If the tenant is unable to comply with the court's order under subsection (a) in paying the required amount of rent into the

## III.

For the foregoing reasons, we conclude that jurisdiction in this case lies with the circuit court. Accordingly, we vacate the district court's judgments and remand to district court for proceedings consistent with this opinion.

*Philip D. Bogetto* for defendants–appellants Tingco and Ramiro.

*David M. K. Lum* (*Ronald R. Sakamoto* with him on the brief) for plaintiff–appellee.

---

court, the landlord shall have judgment for possession and execution of such issue accordingly[.]

HRS § 521–78 (1985).